## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

**REBECCA SUE FRITZ,**

                    **Plaintiff,**

        **vs.**

**CAROLYN W. COLVIN, Acting
Commissioner of the Social Security
Administration,**

                    **Defendant.**

**CASE NO.  4:13CV3186**


**MEMORANDUM
AND ORDER**

Rebecca Sue Fritz filed a complaint on November 7, 2013, against Carolyn W. Colvin, the Acting Commissioner of the Social Security Administration. (ECF No. 1.) Fritz seeks a review of the Commissioner's decision to deny her application for disability insurance benefits under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 401 et seq. The defendant has responded to Fritz's complaint by filing an answer and a transcript of the administrative record. (See ECF Nos. 6, 7). In addition, pursuant to the order of Senior Judge Warren K. Urbom, dated January 13, 2014, (ECF No. 9), each of the parties has submitted briefs in support of her position. (See generally Pl.'s Br., ECF No. 10; Def.'s Br., ECF No. 17, Pl.'s Reply Br., ECF No. 19). After carefully reviewing these materials, the court finds that the Commissioner's decision should be affirmed.

### I. PROCEDURAL HISTORY

Fritz, who was born on June 24, 1965, (tr. 48) filed an application for disability insurance benefits under Title II on February 4, 2011. (Tr. 122, 130). She alleged an onset date of December 2, 2009. (Tr. 146). Fritz's application for disability benefits was denied initially on February 15, 2011, (tr. 52) and on reconsideration on August 1, 2011.

(Tr. 70). At Fritz's request, a hearing was held before an administrative law judge (ALJ) on September 19, 2012. (Tr. 170). Fritz amended the alleged onset date to December 29, 2009. (Tr. 170). On September 26, 2012, the ALJ found that Fritz had not been under a disability from December 29, 2009, through March 31, 2010, the last date insured. (Tr. 8-18).

An ALJ is required to follow a five-step sequential analysis to determine whether a claimant is disabled. *See* 20 C.F.R. § 404.1520(a). The ALJ must continue the analysis until the claimant is found to be "not disabled" at steps one, two, four or five, or is found to be "disabled" at step three or step five. *See id.* Step one requires the ALJ to determine whether the claimant is currently engaged in substantial gainful activity (SGA). *See* 20 C.F.R. § 404.1520(a)(4)(i), (b). The ALJ found that Fritz had not engaged in SGA during the period from her alleged onset date of December 29, 2009, through her last date insured of March 31, 2010. (Tr. 13).

Step two requires the ALJ to determine whether the claimant has a "severe impairment." 20 C.F.R. § 404.1520(c). A "severe impairment" is an impairment or combination of impairments that significantly limits the claimant's ability to do "basic work activities" and satisfies the "duration requirement." *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), (c), 404.1509 ("Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months."). Basic work activities include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out, and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers

2

and usual work situations"; and "[d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b). If the claimant cannot prove such an impairment, the ALJ will find that the claimant is not disabled. *See* 20 C.F.R. § 404.1520(a)(4)(ii), (c). The ALJ found that Fritz had the following severe impairments: degenerative disc disease and a fractured tailbone. (Tr. 13).

Step three requires the ALJ to compare the claimant's impairment or impairments to a list of impairments. *See* 20 C.F.R. § 404.1520(a)(4)(iii), (d); *see also* 20 C.F.R. Part 404, Subpart P, App'x 1 (20 C.F.R. §§ 416.920(d), 416.925 and 416.926). If the claimant has an impairment "that meets or equals one of [the] listings," the analysis ends and the claimant is found to be "disabled." *See* 20 C.F.R. § 404.1520(a)(4)(iii), (d). If a claimant does not suffer from a listed impairment or its equivalent, then the analysis proceeds to steps four and five. *See* 20 C.F.R. § 404.1520(a). The ALJ found that Fritz did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 14).

Step four requires the ALJ to consider the claimant's residual functioning capacity (RFC)[1] to determine whether the impairment or impairments prevent the claimant from engaging in "past relevant work." *See* 20 C.F.R. § 404.1520(a)(4)(iv), (e), (f). If the claimant is able to perform any past relevant work, the ALJ will find that the claimant is not disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iv), (f). The ALJ found that Fritz had no past relevant work. (Tr. 17).

---

[1]   "'Residual functional capacity' is what the claimant is able to do despite limitations caused by all of the claimant's impairments." *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)).

At step five, the ALJ must determine whether the claimant is able to do any other work considering her RFC, age, education, and work experience. If the claimant is able to do other work, she is not disabled. The ALJ found that Fritz had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) and 416.967(b). (Tr. 14). The ALJ found that Fritz could only occasionally climb, balance, stoop, kneel, crouch, or crawl. She should avoid concentrated exposure to extreme cold, vibrations, and hazardous conditions. (Tr. 14).

Considering Fritz's age, education, work experience, and RFC, the ALJ found there are jobs that exist in significant numbers in the national economy that Fritz could perform. (Tr. 17). Therefore, Fritz had not been under a disability from the alleged onset date through the date last insured. (Tr. 18). The Appeals Council denied further review on October 10, 2013. (Tr. 1-6). Thus, the ALJ's decision stands as the final decision of the Commissioner, and it is from this decision that Fritz seeks judicial review.

## II. FACTUAL BACKGROUND

### A.    Medical Evidence

In 2004, Fritz began treatment with a chiropractor for left shoulder and neck pain. (Tr. 259). In March 2009, prior to her alleged onset date, Fritz reported frequent recurrence of mild neck pain and pain in the posterior left cervical area and lumbar area. She underwent a chiropractic adjustment and heat and electrical therapy. (Tr. 272). She reported some improvement in the cervical pain in the next several months, but continued to report pain in the lower lumbar area. (Tr. 273-75).

On December 29, 2009, Fritz fell and fractured her tailbone. (Tr. 309). She did not go to the physician until January 18, 2010, and was given pain medication. (Tr.

4

309). There is no evidence of any further medical treatment until September 28, 2010, when Fritz returned complaining of coccygeal pain and discomfort, and stiffness and soreness, especially at night. She reported that the pain improved if she kept moving, but it was worse with any lifting or twisting type of activity. (Tr. 309). Fritz was told to continue stretching exercises and to see a reflexologist. She could not tolerate any anti-inflammatory, so she was prescribed Lyrica. Her neck and shoulder pain was diagnosed as likely myofascial syndrome. (Tr. 310).

On October 1, 2010, Fritz reported lightheadedness, dizziness, and nausea related to the medication. She was given a prescription for Savella, which she reported six days later was not working. An examination showed she had normal cervical-dorsal and lumbosacral range of motion without scoliosis. She was given Vicodin, and an MRI was ordered. (Tr. 310).

An MRI of the lumbosacral spine showed disc space height and signal was fairly well-maintained. There were no compression fractures and no significant bone marrow edema. The exam showed minimal thoracolumbar spondylosis at T12-L1, disc space narrowing, disc desiccation, and small broad-based disc bulge without central canal or foraminal stenosis. Within the lumbar spine there was a small broad-based disc bulge at L5-S1 with mild multilevel facet joint hypertrophy, but there were no significant disc protrusions. (Tr. 279). Fritz underwent an epidural steroid injection. (Tr. 278, 295). She was told if the injection did not improve her condition, she would need to see an orthopedic surgeon. (Tr. 295).

Fritz continued to complain of groin pain and discomfort and stated that she had marked difficulties in activities of daily living. (Tr. 311). She was given a refill for

5

hydrocodone. (Tr. 311). On December 10, 2010, Fritz reported soreness at the injection site of her epidural. (Tr. 311). By January 31, 2011, she again reported ongoing low back pain and discomfort and stated that the epidural had not helped significantly. (Tr. 311). She was given lumbar exercises. Fritz stated she would continue seeing the reflexologist, but she was going to stop the muscle relaxer because it caused increased confusion. (Tr. 312). Fritz saw a reflexologist from January 25, 2010, to June 6, 2011. (Tr. 321, 362-74).

Fritz underwent a mental health assessment after a short history of anxiety attacks in February 2011. (Tr. 299). She reported that the pain from her tailbone injury had never healed. (Tr. 300). She was assessed as having panic disorder without agoraphobia. (Tr. 301). Fritz was on medication for anxiety, but felt that she could do better with more talk therapy. (Tr. 301).

On March 31, 2011, Fritz went to John Treves, M.D., a spine surgeon, for neck, shoulder and arm pain, and back, buttocks, and lower extremity pain. (Tr. 335, 387). Her gait was a bit slow and guarded, but she transitioned from a sitting to a standing position rather well. Her cervical and lumbar range of motion was diminished. She had no tenderness to palpation of the spinous processes and paravertebral musculature bilaterally. Straight leg raise did not produce radicular pain or paresthesias bilaterally. No gross joint instability or crepitus was noted of the lower extremities bilaterally with strength testing. (Tr. 335). Dr. Treves stated that the mildly degenerative discs at T12-L1 and L5-S1 could be causing some back pain, but the MRI showed nothing that would account for any radiating lower extremity pain. He stated there was no surgical option to

6

offer. (Tr. 336). Flexion and extension x-rays showed her alignment was normal and conservative treatment was continued. (Tr. 334).

In June 2012, it was determined that Fritz had an area of full thickness non-retracted tear in the rotator cuff. She chose to continue physical therapy. (Tr. 398-99).

Allan Tramp, M.D., completed a spine questionnaire in September 2012, in which he stated that Fritz's prognosis was guarded. She had chronic pain, tenderness, crepitus, muscle spasms and weakness, chronic fatigue, spastic gait, impaired sleep, lack of coordination, abnormal posture, and reduced grip strength. (Tr. 427). Dr. Tramp stated that Fritz was incapable of even low stress jobs because she became frustrated easily and her concentration was affected. (Tr. 429).

**B.    Medical Opinion Evidence**

Helen Montoya, Ph.D., completed a psychiatric review technique on June 1, 2011, and found no medically determinable impairment. (Tr. 339). Montoya noted that Fritz had no history of psychological conditions from the alleged onset date to the date of last insured, and there was no evidence of treatment for such. (Tr. 351). Linda Schmechel, Ph.D., affirmed the psychiatric review technique and found no medically determinable impairment. (Tr. 381).

In a physical RFC on June 1, 2011, Jerry Reed, M.D., found that Fritz could occasionally lift and/or carry up to 20 pounds and could frequently lift and/or carry 10 pounds. She could stand and sit about six hours in an eight-hour workday. She was unlimited in her ability to push and/or pull. (Tr. 354). She could occasionally climb a ramp or stairs, balance, stoop, kneel, crouch, or crawl. She had a history of degenerative disc disease which had been treated conservatively with medications and

occasional chiropractic care. Dr. Reed said Fritz should avoid frequent postures, but evidence suggested that she was capable of occasional postures. (Tr. 355). Fritz had no manipulative, visual, or communicative limitations. (Tr. 356-57). She should avoid concentrated exposure to extreme cold, vibration, and hazards. (Tr. 357). Dr. Reed determined that the overall evidence indicated Fritz had degenerative disc disease with a history of a coccyx fracture, which would cause some restrictions in heavy lifting, frequent bending, stooping, and crouching. Dr. Reed found Fritz to be partially credible in that she had conditions that caused some limitations, but not to the extent to prevent all types of work activity. She appeared capable of work as outlined in the RFC. (Tr. 360). Marvin Holsclaw, M.D., agreed with Dr. Reed's RFC. (Tr. 379-80).

Gerald Spethman, M.D., completed a physical RFC on July 27, 2011. (Tr. 382). He affirmed the earlier RFC, finding there were no new sources listed at the reconsideration level within the relevant timeframe. Fritz appeared capable of light work activity for the time from the alleged onset of disability to date of last insured. (Tr. 382).

## C.    Hearing Evidence

At a hearing on September 19, 2012, Fritz testified that after she fractured her tailbone in December 2009, she could not walk normally for two weeks. She also jarred her shoulders and neck, but she did not go to the doctor until January 2010. (Tr. 29, 38-39, 30). Then her sciatic nerve began hurting every day. (Tr. 30). Fritz said she needed her husband to help her get dressed because she could not bend over. (Tr. 31). She was not able to clean the house, go to the grocery store, or cook meals. (Tr. 32). Fritz said her pain on an average day rated as a six out of 10. (Tr. 34). Once a month she was unable to get out of bed. (Tr. 34). Fritz said she was unable to sleep at night, so

she took naps of about an hour during the day. She was able to drive short distances. (Tr. 36). Fritz said there had been no improvement in the two years since she first was injured. (Tr. 42). She was going to a massage therapist weekly, because nothing else seemed to help the pain. (Tr. 42).

In response to a hypothetical question, the VE stated that the only prior job Fritz could still handle was as a companion. A hypothetical individual with the same age, education, and work history and who was limited to work at the light exertional level, who could occasionally climb, balance, stoop, kneel, crouch, and crawl, should avoid concentrated exposure to extreme cold, vibrations and hazardous conditions, could work at other representative including a bench assembler, which was light, simple, and unskilled and had 510 jobs in Nebraska and 100,500 in the U.S. She could work as a cashier II, which was also light, simple and unskilled and had 3,000 jobs in the state and 1,400,000 in the U.S., and she could work as a collator operator, which was light, simple, and unskilled and had 400 jobs in the state and 36,310 in the U.S. (Tr. 45). If the hypothetical individual could sit for less than two hours a day, stand or walk for less than two hours a day, and would need to lie down frequently, there would be no work available in the competitive market. (Tr. 45-46).

## D.    Additional Evidence

In interrogatories dated July 16, 2012, Fritz stated that she could not work because she cannot lift, stand, or sit for periods and most jobs require those abilities. (Tr. 234). She said she cannot bend down to pick up items or reach into the top cupboard. If she walked or stood for a length of time, her back hurt and she had to sit down. (Tr. 234). Fritz stated she had intense pain in her shoulders, neck, and lower

9

back. (Tr. 235). She said she was taking meloxicam and Celebrex, which worked for a couple of hours, but then the pain returned. (Tr. 236). She had no side effects from the medications. (Tr. 236). Fritz also used Thermacare wraps and Aspercreme. She was going to physical therapy for her left arm and the doctor showed her exercises for her back, but she said she could not get her back and shoulders to function. (Tr. 237). Fritz stated she could walk a short distance, stand for 15 minutes, and sit for 20 minutes. She was able to take care of her personal needs and did some cooking, but her husband did other chores, including laundry and vacuuming. (Tr. 240).

### III.  STANDARD OF REVIEW

This court must review the Commissioner's decision to determine "whether there is substantial evidence based on the entire record to support the ALJ's factual findings." *Johnson v. Chater*, 108 F.3d 178, 179 (8th Cir. 1997) (quoting *Clark v. Chater*, 75 F.3d 414, 416 (8th Cir. 1996)).  *See also Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011). "Substantial evidence is less than a preponderance but enough that a reasonable mind might accept as adequate to support the conclusion." *Kamann v. Colvin*, 721 F.3d 945, 950 (8th Cir. 2013) (internal citations omitted).  A decision supported by substantial evidence may not be reversed, "even if inconsistent conclusions may be drawn from the evidence, and even if [the court] may have reached a different outcome."  *McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010).  Nevertheless, the court's review "is more than a search of the record for evidence supporting the Commissioner's findings, and requires a scrutinizing analysis, not merely a 'rubber stamp' of the Commissioner's action."  *Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 821 (8th Cir. 2008) (citations, brackets, and internal quotation marks omitted).  *See also Moore v. Astrue*, 623 F.3d

10

599, 602 (8th Cir. 2010) ("Our review extends beyond examining the record to find substantial evidence in support of the ALJ's decision; we also consider evidence in the record that fairly detracts from that decision.").

This court must also determine whether the Commissioner's decision "is based on legal error." *Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011) (quoting *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000)). "Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law." *Id.* (citations omitted). No deference is owed to the Commissioner's legal conclusions. *See Brueggemann v. Barnhart*, 348 F.3d 689, 692 (8th Cir. 2003). *See also Collins*, *supra*, 648 F.3d at 871 (indicating that the question of whether the ALJ's decision is based on legal error is reviewed de novo).

## IV.    ANALYSIS

### A.    RFC Assessment

Fritz argues that the ALJ's RFC assessment was wrong in several respects. She asserts that the ALJ did not consider all of the medical evidence in the record, did not account for all of her functional limitations, improperly weighed the medical opinions and the third-party statements, and relied upon incomplete vocational expert testimony.

It is Fritz's burden to demonstrate that she has an impairment that is presumed to be disabling. She must show through medical evidence that her impairment met all of the specified medical criteria contained in a particular listing. *Carlson v. Astrue*, 604 F.3d 589, 593 (8th Cir. 2010) (internal citation omitted).

As noted above, RFC is the most a claimant is able to do despite limitations caused by all of the claimant's impairments. *Lowe v. Apfel*, *supra*. Because a claimant's

4:13-cv-03186-LSC   Doc # 20   Filed: 07/25/14   Page 12 of 23 - Page ID # 554

RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace. *Cox v. Astrue*, 495 F.3d 614, 619-20 (8th Cir. 2007). Nevertheless, in evaluating a claimant's RFC, an ALJ is not limited to considering medical evidence exclusively. *Id.* "Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner." *Id.*, 614 F.3d at 619.

The ALJ determines a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own descriptions of her limitations. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). A disability claimant has the burden to establish her RFC. *Id.*

The ALJ found that Fritz had severe impairments of degenerative disc disease and a fractured tailbone. (Tr. 13). The ALJ determined that Fritz had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) with additional postural limitations, and that she could find work at representative jobs, such as a bench assembler, cashier II, or collator operator. (Tr. 14).

Between Fritz's alleged onset date of December 29, 2009, and her date last insured of March 31, 2010, there was evidence of only one medical treatment. On January 18, 2010, Fritz went to a physician's assistant (PA) complaining of an inability to sit after she had fallen on her tailbone three weeks earlier. (Tr. 309). It was determined that Fritz had a small fracture in her coccyx, but the PA did not observe any spasms, reduced range of motion, reduced strength, or reduced sensation. (Tr. 309). Fritz was prescribed pain medication and did not return for additional medical treatment until September 2010.

12

The ALJ considered other medical records of treatment after Fritz's date last insured. In October 2010, she had normal range of motion in her back with no paravertebral spasm or tenderness, normal strength and tone, and a normal gait and station. (Tr. 310). In March 2011, Fritz had no tenderness to palpation of the spinous processes and paravertebral musculature when she was examined by a spine specialist. (Tr. 335). By June 2012, when Fritz complained of shoulder pain, she had no other musculoskeletal symptoms. (Tr. 406). The medical records support the ALJ's determination.

The results of MRIs and x-rays also support the ALJ. An MRI revealed that Fritz had minimal spondylosis, a small disc bulge, and mild facet-joint hypertrophy. X-rays in March 2011 showed no significant pathologic motion of her back. *See* Steed *v. Astrue*, 524 F.3d 872, 875-76 (8th Cir. 2008) (substantial evidence of only mild degenerative changes in the back support a finding that a claimant can perform light work).

The ALJ's finding is also supported by evidence that Fritz received conservative care for her impairments. (Tr. 16). At the appointment in January 2010, Fritz was prescribed only medication. By September 2010, she was taking only Tylenol for her pain. (Tr. 309). The spine specialist recommended conservative care in March 2011. (Tr. 336). *See Forehand v. Barnhart*, 364 F.3d 984, 985 (8th Cir. 2004) (conservative course of treatment supported ALJ's finding that claimant was not disabled.)

The ALJ found that Fritz's statements concerning the intensity, persistence, and limiting effects of her symptoms were not credible to the extent they were inconsistent with the RFC assessment. The ALJ stated that Fritz's credibility was primarily undermined by a paucity of objective medical evidence. The record indicated that she

received only minimal treatment during the period in question. There was only one encounter with a physician in the relevant time period, though she did go to therapeutic massage treatment. The objective medical evidence for the period prior to Fritz's date last insured was sparse and did not support the degree of limitation alleged. In addition, the ALJ noted that Fritz's pain journals, which were admitted into evidence, did not deal with the relevant period prior to the date last insured. Therefore, the ALJ gave her statements regarding the intensity, persistence, and limiting effects of her impairments only partial weight. (Tr. 15).

The ALJ noted a lengthy history of chiropractic treatment prior to the alleged onset date of December 2007, including a history of an accident in 1990 and a fall in 1995. However, those chiropractic records indicated only mild neck and lumbar pain throughout the period and that treatment was generally successful. The ALJ also noted that Fritz continued to work throughout much of the period prior to her alleged onset date. Thus, the record supported a degree of mild back pain prior to December 2009. Aside from the records related to the fractured tailbone, there was no further medical evidence covering the period between December 29, 2009, and March 31, 2010. (Tr. 15). Fritz continued massage treatment, but did not seek any further medical treatment until September 2010. (Tr. 15). The ALJ properly determined Fritz's RFC and that she is capable of performing light work.

### B.    Alleged Failure of ALJ to Consider All Medical Evidence

Fritz also argues that the ALJ failed to properly consider all medical evidence in the record. She claims that, pursuant to SSR 83-20, it may be difficult to determine the proper onset date for a slowly progressive impairment. Fritz asserts that "where a

claimant does not have contemporaneous objective medical evidence of the onset of the disease, the ALJ must consider all of the evidence on the record as a whole, including the lay evidence and the retrospective conclusions and diagnosis of her doctor." *Grebenick v. Chater*, 121 F.3d 1193, 1198 (8th Cir. 1997).

Fritz's reliance on SSR 83-20 is misplaced. The ruling addresses the method used to determine a claimant's onset date. However, in this case, there is no dispute about Fritz's alleged onset date. She originally listed her onset date as June 14, 2004, in her application for benefits, but she later amended the onset date to December 29, 2009, to coincide with the date she fell and broke her tailbone. (Tr. 146). SSR 83-20 provides that for disabilities of traumatic origin, the onset date is the day of the injury. Fritz chose the date of her fall as the onset date.

If Fritz is attempting to suggest that the ALJ should have considered the medical evidence after her date last insured, her argument is unavailing. In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status. *See* 42 U.S.C. §§ 416(i), 423(c). "Evidence of a disability subsequent to the expiration of one's insured status can be relevant, however, in helping to elucidate a medical condition during the time for which benefits might be rewarded." *Pyland v. Apfel*, 149 F.3d 873, 877 (8th Cir. 1998). The evidence, however, must relate to the period at issue and not to a subsequent deterioration of a previously non-disabling condition. *Jones v. Callahan*, 122 F.3d 1148, 1154 (8th Cir. 1997). Evidence outside the relevant time period cannot serve as the only support for the disability claim because "such a holding would be contrary to the Social Security Act, 42

U.S.C. §§ 416(i), 423(c), which requires proof of disability during the time for which it is claimed." *Pyland v. Apfel*, *supra*, 149 F.3d at 878.

Fritz alleged an onset date of December 29, 2009, and sought treatment on January 18, 2010. There are no treatment records between the date last insured in March 2010 and September 2010. No evidence in the record suggests that the treatment records after September 2010 reflect her condition six months earlier. Fritz stated in a disability report that her symptoms worsened after March 2011, which is long after her date last insured. The fall in December 2009 apparently caused some of her back pain, but she was seeing a chiropractor for the pain for years prior to the fall. But nothing in the record explains whether the level of pain and her alleged limitations have remained the same since her date last insured. The medical evidence after September 2010 was not related to the relevant period.

The ALJ took the entire medical record into consideration in formulating Fritz's RFC. He referred to diagnostic testing in 2010 and 2011 and the neurosurgical evaluation from 2011. (Tr. 15-16). The ALJ relied on Dr. Reed's opinion, and he also took into consideration evidence after Fritz's date last insured. (Tr. 360). The court finds no error in the ALJ's consideration of the evidence in determining the RFC.

## C.    Weight Assigned to Medical Sources of Record

Fritz argues that the ALJ erred in assigning weight to the opinions of the medical sources. Her main argument relates to the opinion of Dr. Tramp, who completed a spine questionnaire in September 2012. In it, Dr. Tramp stated that Fritz had chronic pain, tenderness, crepitus, muscle spasms and weakness, chronic fatigue, spastic gait, impaired sleep, lack of coordination, abnormal posture, and reduced grip strength. (Tr.

16

427). He believed that Fritz could not handle even a low stress job because she was easily frustrated. (Tr. 429). She could walk one or two blocks, sit for five or 10 minutes and stand for 10 or 15 minutes. She could sit, stand, or walk for less than two hours, but she would need frequent breaks and needed to lie down frequently. Fritz would need to walk around every 10 minutes and walk for six or seven minutes and would need a job that allowed shifting positions at will from sitting, standing, or walking. She would need to take unscheduled breaks during an eight-hour working day. (Tr. 430). Fritz would not need to use any assistive device, but she could never lift any weight and could rarely look down, turn her head right or left, look up, or hold her head in a static position. She could never climb ladders, could rarely climb stairs, rarely twist or stoop, and occasionally crouch or squat. (Tr. 431). Fritz could grasp, turn, or twist objects and reach her arms less than 10 percent of an eight-hour workday, and could do fine manipulations with her fingers less than 20 percent of the day. (Tr. 431). Dr. Tramp said Fritz was always limited but could have rare good days. She would be likely to miss work more than four days per month. (Tr. 432). The ALJ gave little or no weight to Dr. Tramp's opinion. (Tr. 16).

Tramp stated that he had treated Fritz since 1990. (Tr. 427). Treating opinions are generally entitled to greater weight than opinions from other medical sources because treating physicians are more familiar with the claimant's impairments and have a "unique perspective" that cannot be obtained during a single examination. *See* 20 C.F.R. § 404.1527(c)(1)-(2). The opinion of a treating source must be given controlling weight if the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the

17

record. *Id.* "A treating physician's opinion is generally given controlling weight, but is not inherently entitled to it." *Travis v. Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007).

"An ALJ may elect under certain circumstances not to give controlling weight to treating doctors' opinions. A physician's statement that is 'not supported by diagnoses based on objective evidence' will not support a finding of disability. *Id.*, *quoting Edwards v. Barnhart*, 314 F.3d 964, 967 (8th Cir.2003). If the doctor's opinion is "inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight." *Id.* It is the ALJ's duty to resolve conflicts in the evidence. *Id. See also Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001); *Davidson v. Astrue*, 578 F.3d 838, 843 (8th Cir. 2009).

The ALJ gave little credit to Dr. Tramp's opinion because it was completed more than two years after Fritz's date last insured. (Tr. 16, 427-32). The ALJ noted that nothing in the opinion indicated that it related to the period between the alleged onset date and the date last insured. Therefore, there was no basis to relate Dr. Tramp's assessment back to the relevant period in 2010. In addition, the opinion was inconsistent with the objective medical evidence for the period in question. Dr. Tramp's opinion indicated that only some of Fritz's back pain was related to the fall that occurred on the alleged onset date. (Tr. 434). Dr. Tramp examined Fritz at the time of the questionnaire, and it refers to some of his findings from that examination. It therefore included objective findings that were not in evidence prior to Fritz's date last insured.

Dr. Tramp's opinion also mentioned crepitus in the left knee, weakness in the left leg, and abnormal posture. (Tr. 427-28). The objective medical evidence prior to March 2010 did not mention any of these symptoms. (Tr. 309). Fritz was reported to have a

normal gait in October 2010, and an examination in March 2011 showed no crepitus. (Tr. 310, 335).

In addition, Dr. Tramp stated that Fritz could not move her head, but objective medical evidence prior to March 2010 did not mention any reduced range of motion. (Tr. 309, 431). At an appointment on March 4, 2010, Fritz was reported to have a supple neck. (Tr. 309). At an appointment in September 2010, Fritz had slightly decreased range of motion in her neck, but the following month, she had normal range of motion in her neck. (Tr. 309-10). This again shows that Dr. Tramp based his limitations on the examination in September 2012 and found limitations that were not obvious prior to the date last insured. Dr. Tramp's opinion that Fritz was markedly limited in her ability to sit, stand, walk, and lift was inconsistent with the objective medical evidence, including diagnostic test results. And his opinion was inconsistent with the evidence that Fritz received conservative care.

Dr. Tramp also stated that Fritz was restricted because she was easily frustrated and had difficulty concentrating. (Tr. 429). The record includes no objective findings to support this restriction, either prior to or after the last date insured. Other providers described Fritz as alert. (Tr. 310-12, 388, 398, 435). Fritz demonstrated no difficulties with concentration and attention during a February 2011 mental status examination. (Tr. 301). There is no evidence that Dr. Tramp conducted any test to measure Fritz's concentration.

The court finds that substantial evidence supported the ALJ's finding that Dr. Tramp's opinion deserved only little weight. And even if his opinion had been granted controlling weight and might support a finding of disability, the court will not disturb the

19

ALJ's finding of no disability because other substantial record evidence supports the ALJ's conclusion. An administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion. *Pearsall v. Massanari*, *supra*, 274 F.3d at 1219.

Fritz also objects to the weight the ALJ gave to the opinions of non-examining doctors. The ALJ gave great weight to the opinion of Dr. Reed, who was familiar with the rules, regulations, and standards in the evaluation of disability claims. His opinion was well-supported by his own narrative explanation and was consistent with the objective medical evidence as a whole. His opinion was later affirmed by two other reviewing state agency physicians. (Tr. 16).

"It is well settled that an ALJ may consider the opinion of an independent medical advisor as one factor in determining the nature and severity of a claimant's impairment." *Hacker v. Barnhart*, 459 F.3d 934, 939 (8th Cir. 2006), *quoting Harris v. Barnhart*, 356 F.3d 926, 931 (8th Cir.2004). The regulations specifically provide that the opinions of non-treating physicians may be considered. 20 C.F.R. § 404.1527(f). An ALJ may "'discount or even disregard the opinion of a treating physician (1) where other medical assessments 'are supported by better or more thorough medical evidence,' or (2) where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Cantrell v. Apfel*, 231 F.3d 1104, 1107 (8th Cir. 2000), internal citations omitted. The ALJ specifically explained his reasons for relying on the opinions of the non-treating sources and for discounting the opinion of the treating source. The court finds no error in the weight given to medical opinions by the ALJ.

**D.     Third-Party Opinions**

Next, Fritz objects to the weight given to the third-party opinions. (Pl.'s Br. at 15). The ALJ gave little weight to the third-party statements from Steve McCrerey and Marjorie Blecha. Their opinions offered statements that largely echoed Fritz's own allegations. The ALJ determined that the opinions consisted of the observations of a layperson based on casual observation rather than objective medical evidence or testing. (Tr. 16). Furthermore, there was no basis to connect the opinions specifically to the relevant period prior to the date last insured. (Tr. 17).

Blecha, Fritz's mother, stated that Fritz began complaining of back and neck issues in 2004 and that she had visited a chiropractor and physicians. (Tr. 210). Blecha stated she had witnessed incidents where Fritz's back caused her pain so she could not sit, stand, or bend over. Blecha said Fritz became agitated easily when she was limited by her back issues. (Tr. 210). Blecha later wrote that she and Fritz could no longer do the activities they had previously done together. (Tr. 227). Fritz could no longer go shopping or sit to play a game because she could not concentrate. She had become more aggravated and depressed. (Tr. 227). McCrerey, a friend of Fritz's, stated that he had known Fritz since 2005 from church. (Tr. 211). McCrerey stated that Fritz had become unable to stand or sit for long periods and she got upset when she could not do an activity when her back tensed up or went into spasms. (Tr. 211).

Fritz relies on SSR 06-03p, which provides that "information from 'other sources' may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." She

21

objects to the failure of the ALJ to thoroughly discuss his reasons for not giving more credence to the third-party opinions.

In *Buckner v. Astrue*, 646 F.3d 549, 560 (8th Cir. 2011), the U.S. Court of Appeals for the Eighth Circuit upheld an ALJ's decision, even though the ALJ did not specifically address a third party's statement. The same evidence that discredited the claimant's testimony also discredited the third party's statement. In this case, the lack of supporting objective evidence also discredited the statements of Blecha and McCrerey, and the ALJ did not err in failing to give those statements greater weight.

**E.    VE's Testimony Cannot Serve as Substantial Evidence**

Finally, Fritz argues that the testimony of the VE cannot serve as substantial evidence. (Pl.'s Br. at 17). She asserts that Dr. Tramp's opinion that Fritz would miss four days of work per month should have been included in the hypothetical questions asked of the VE.

In the sequential evaluation process, the burden of persuasion is with the plaintiff, but at step five, a limited burden of production shifts to the Commissioner. *See Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004). The Commissioner may satisfy this burden through the testimony of a vocational expert. *See* 20 C.F.R. §§ 404.1566€, 416.966(e).

For a VE's opinion to be relevant, an ALJ must accurately characterize a claimant's medical conditions in hypothetical questions posed to the VE. *Harvey v. Barnhart*, 368 F.3d 1013, 1016 (8th Cir. 2004). A VE's answer to a hypothetical question that includes all the limitations in the RFC provides a proper basis for an ALJ's decision. *See id.*

As noted, the ALJ properly gave little weight to Dr. Tramp's opinion. The objective medical evidence does not support Dr. Tramp's opinion that Fritz would be likely to miss four days of work per month, and there is no reason that allegation should have been included in the hypothetical question.

The ALJ was justified in relying on the VE's testimony as substantial evidence in finding that Fritz was not disabled. *See* 20 C.F.R. §§ 401.1566(e), 416.966(e). The ALJ met the Commissioner's burden to show that a significant number of jobs exist in the national economy that an individual with Fritz's impairments, symptoms, and limitations could perform.

## V.    CONCLUSION

For the reasons discussed, the court concludes that the Commissioner's decision is supported by substantial evidence on the record as a whole and should be affirmed. Accordingly,

IT IS ORDERED:

1.      The Commissioner's decision is affirmed;

2.      The appeal is denied; and

3.      Judgment in favor of the defendant will be entered in a separate document.

Dated this 25th day of July, 2014

                                        BY THE COURT:


                                        s/Laurie Smith Camp
                                        Chief United States District Judge